## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

*12·1816 JNE/TN*

Case No.: _____

Rodd Wagner,

       Plaintiff,

v.

                            **COMPLAINT AND**
                            **JURY DEMAND**

Gallup, Inc.,

       Defendant.

---

The Plaintiff, Rodd Wagner ("Plaintiff"), for his Complaint against Defendant

Gallup, Inc. ("Defendant"), states and alleges as follows:

### PARTIES, JURISDICTION & VENUE

1.     This Complaint seeks to remedy Defendant's discrimination based on age

in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01, *et*

*seq.*

2.     At all relevant times, Plaintiff resided in and was a citizen of Minnesota.

Plaintiff was 50 years old at the time Defendant terminated his employment.

3.     Defendant is a Delaware corporation with its principal place of business in

Omaha, Nebraska.

4.     Defendant is an international company that provides various services to

clients around the world, including employee engagement consulting for clients around

the world.

5.     Defendant states on its website that "Gallup consultants help organizations



SCANNED
JUL 2 5 2012
U.S. DISTRICT COURT MPLS

boost organic growth by increasing customer engagement and maximizing employee productivity through measurement tools, coursework, and strategic advisory services. Gallup's 2,000 professionals deliver services at client organizations, through the Web, at Gallup University's campuses, and in more than 40 offices around the world."

6.     At all times relevant hereto, Plaintiff and Defendant were "employee" and "employer," respectively, as those terms are defined in Minn. Stat. § 363A.03.

7.     Jurisdiction is proper in the United States District Court for the District of Minnesota pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are diverse parties and the matter in controversy exceeds $75,000.00.

8.     Venue is proper in this Court because the unlawful, discriminatory practices alleged herein occurred in the State of Minnesota and Defendant conducts substantial business in the State of Minnesota.

**FACTS**

9.     Plaintiff was recruited and hired by Defendant in or around January 1999.

10.     Plaintiff moved his family from Portland, Maine, when hired as a Managing Consultant for Defendant, based in Defendant's Minneapolis, Minnesota, office.

11.     As Managing Consultant Plaintiff oversaw the delivery of customer loyalty and employee engagement work on behalf of Defendant's clients.

12.     Plaintiff was the first consultant working out of Defendant's Minneapolis office, in what had previously been only a sales office, and assisted in making the Minneapolis office one of the most highly regarded within the company.

13.    Throughout his tenure with Defendant, Plaintiff was the most senior consultant in the Minneapolis office.

14.    Plaintiff later held the titles of "Principal," "Strategic Consultant," and "Subject Matter Expert" as title conventions changed within Defendant.

15.    During the course of Plaintiff's employment with Defendant, he was a diligent and innovative consultant and thought leader.

16.    Plaintiff was appointed a member of the firm's Board of Principals and served in that capacity until the board was disbanded by company leadership.

17.    Plaintiff served and was advertised externally as a "core faculty" member of the Gallup Leadership Academy.

18.    Plaintiff was a trusted and confidential advisor to senior executives and government leaders. He represented Defendant in keynote speeches to industry groups and company conferences, in broadcast and print media interviews, and as a "contributing author" in the *Gallup Management Journal*.

19.    Plaintiff's work was routinely incorporated into Defendant's training programs.

20.    Plaintiff traveled extensively and frequently on behalf of Defendant.

21.    In furtherance of Plaintiff's business, Plaintiff acquired a U.S. government security clearance, subjecting himself to an extensive background investigation and full-scope polygraph.

22.    Plaintiff was given numerous awards for his work, including but not limited

3

to, "Brilliance in Government Consulting," Gallup "Royal Star" awards, Million-Dollar Roundtable Account Leadership awards, HumanSigma Discovery Award, and the Innovation Award.

23.    Plaintiff played a substantial role in reinvigorating Defendant's "$Q^{12}$" employee engagement practice, development of Defendant's "$CE^{11}$" customer engagement practice (including interviews composing a large part of the Gallup Press book *Married to the Brand*), and development of the Defendant's collaboration practice.

24.    At Defendant's urging, Plaintiff invested heavily in Defendant's stock, both in Plaintiff's 401k retirement account and as non-tax-deferred investment.

25.    Representatives of Defendant routinely showed Defendant's stock performing at above-market levels, materially omitting below-market returns that would result on the sale of the stock, when Defendant reserved the right to pay the proceeds over a four-and-a-half-year period at nominal interest rates.

26.    Gallup stock was Plaintiff's largest single investment and a large component of his family and retirement savings.

27.    Based on Defendant's representations and material omissions, out of loyalty to Defendant and, later in his employment, concern any stock sale would be considered disloyal, Plaintiff maintained his investment in Defendant's stock, even as other employees created what Defendant's Chairman James K. Clifton termed "a run on the bank," or words to that effect.

28.    Plaintiff authored two books as an employee of Defendant, one of them a

4

*New York Times* bestseller, and recorded the audiobook versions of both books.

29.    Both books are the intellectual property of Defendant, and were edited and otherwise vetted to ensure they spoke on behalf of Defendant.

30.    Plaintiff's two books have been published in 10 different languages, and have been and continue to be held out by Defendant as setting the proper standard for the ethical and moral responsibilities a company owes its employees.

31.    Defendant is widely known in human resources circles for its proprietary "$Q^{12}$" employee engagement metric. Measurement and consulting around the "$Q^{12}$" make up a substantial portion of Defendant's revenues and were the majority of Plaintiff's client portfolio during his tenure with Defendant.

32.    The "$Q^{12}$" is the subject of the first book written by Plaintiff for Defendant, *12: The Elements of Great Managing*.

33.    Among the 12 key statements on the "$Q^{12}$" metric is, "In the last six months, someone at work has talked to me about my progress." Defendant routinely advised clients that managers should talk frequently and individually about their performance, their goals, and their strengths, and develop plans that fit well with each employee's unique abilities.

34.    Defendant advised clients that an employee should not be taken by surprise should a serious concern with his or her work arise.

35.    More than most companies, Defendant expected a high level of reciprocity, commitment to the company mission, and cohesiveness among its employees.

5

36.    Defendant's CEO, James K. Clifton, routinely referred to the collective body of employees as "The Tribe."

37.    In or around late 2010, Defendant reorganized its business under what it called the "Brussels Decision." Few details of the "Decision" were communicated to employees.

38.    Despite a large number of derogatory comments about Defendant's culture accumulating on social media site Glassdoor.com after the Brussels Decision, Plaintiff did not and has not disparaged Defendant online or in any publication.

39.    While an employee of Defendant, Plaintiff was discrete and professional regarding the profound internal struggles of the company's leadership.

40.    During the final two years of Plaintiff's employment, Plaintiff worked exceptionally diligently to make up for resignations and terminations of key employees on Defendant's client accounts.

41.    Global Chief of Principals Annette Templeton, a former supervisor of Plaintiff, was removed from Defendant's executive committee in December 2010, and demoted, in part, because of her objection to the way the company was proposing to manage its most senior and highly credentialed consultants.

42.    Templeton eventually resigned from Defendant. Upon information and belief, Templeton was approximately 45 years old at the time.

43.    From late 2010 until approximately April 2011, Plaintiff was supervised by Mary Trouba.

6

44. Plaintiff and Trouba had several long and constructive conversations about Plaintiff's work.

45. Throughout those conversations, Trouba told Plaintiff that he performed well, he was well received by his clients, and that his "[billable] hours were in great shape," or words to that effect.

46. Because of disorganization following the Brussels Decision, Plaintiff's pay for 2011 was made identical to pay for 2010.

47. The areas of the compensation form designated for commentary on "content development," "impact," "productivity," and "teamwork/leadership" were all left blank.

48. After implementing the Brussels Decision, Defendant ceased offering voting shares of its stock (termed ownership or "O Class" stock) to all its employees and began to offer non-voting stock (termed management or "M Class" stock) to a select group of approximately 300 employees.

49. In or around March 2011, Defendant's Chief Financial Officer, James R. Krieger, sent an email informing Plaintiff that he was one of those chosen "based on length of service, level of responsibility and highest 20% of respective performance excellence. Our Go-To's then finalized the lists. … Congratulations on this recognition and I look forward to seeing you at the meeting."

50. In or around March 2011, Krieger met in person with the several employees in Defendant's Minneapolis office who were rated the highest performers, including

7

Plaintiff, and urged them to invest additional monies in the new M Class stock, and provided subsidies for the selected employees to incur debt to purchase Defendant's stock.

51.    A PowerPoint presentation delivered by Krieger at this meeting stated the stock was being offered to "foster long-term ownership of Gallup stock" and to "enable future management of Gallup a means to purchase stock."

52.    Defendant's PowerPoint presentation also delineated that the approximately 300 employees were selected because they were Defendant's "desired long-term owners" of the stock.

53.    Plaintiff, already heavily invested in Gallup O Class shares, expressed concern at this meeting that the timing of the sale of the stock and payment of capital gains taxes would not be in his control if he were ever, for whatever reason, laid off or otherwise terminated from Defendant's employ.

54.    Krieger responded to Plaintiff's concern stating, "That's true, but let's be serious. As a practical matter, we're all in control of whether we get terminated or not," or words to that effect.

55.    In or around April 2011, Managing Partner Don Beck, head of Defendant's government division, resigned.

56.    Don Beck supervised Trouba until his resignation.

57.    Upon information and belief, Don Beck was approximately 55 years old and had been demoted in title by Defendant shortly before his resignation.

8

58.    Don Beck was replaced by Jon Clifton, the son of Defendant's CEO, James K. Clifton.

59.    Upon information and belief, Jon Clifton was approximately 28 years old at the time he replaced Don Beck.

60.    In or around April 2011, Defendant terminated Alison Simon, Ph.D., a highly regarded social scientist, accomplished Gallup consultant with nearly 11 years of tenure, and a close collaborator with Plaintiff in their work for the U.S. Navy and U.S. Intelligence Community.

61.    Upon information and belief, Dr. Simon was approximately 46 years old at the time she was terminated.

62.    Plaintiff worked diligently to ensure Defendant's service to the Navy and Intelligence Community suffered as little as possible from the substantial deficit caused by Dr. Simon's termination.

63.    In or around April 2011, unbeknownst to Plaintiff, Patrick Bogart became Plaintiff's supervisor. Neither Bogart nor anyone else at Defendant informed Plaintiff of the change.

64.    Plaintiff was based out of Minneapolis and Bogart was based out of Washington, D.C.

65.    Bogart never met with Plaintiff in person during the entire time he supervised Plaintiff.

66.    Plaintiff traveled regularly to Washington, D.C., providing numerous

9

opportunities for in-person meetings or brief conversations with Bogart. But Bogart never took any initiative to meet with Plaintiff.

67.     Upon information and belief, Patrick Bogart was 35 years old at the time he became Plaintiff's supervisor.

68.     Plaintiff had previously had partial supervisory responsibility for Bogart when Bogart joined Defendant's Minneapolis office in 2004.

69.     In or around May 2011, Plaintiff declined a job offer from another firm, based on his ownership of Defendant's stock and Defendant's represented value of the stock's expected appreciation; as well as Defendant's representations that Plaintiff was a highly valued, top performer and "desired long-term owner" of Defendant's stock; and Plaintiff's commitment to complete a next book commissioned by Defendant..

70.     In or around June 2011, Bogart called Plaintiff to request Plaintiff make a decision in 36 hours to accept a two-month assignment in Baghdad, Iraq, leaving in four weeks.

71.     Life insurance and other accommodations for accepting the assignment to an active battle zone in Iraq were inadequate for Plaintiff's financial responsibilities to his family.

72.     Bogart communicated no plan or intention to plan for how Plaintiff's responsibilities to his existing clients, including a pending major speech to 500 Navy officers, would be discharged in his absence.

73.     Bogart treated Plaintiff differently than Plaintiff's earlier supervisors.

10

74.   Bogart treated Plaintiff differently than he treated other, younger employees.

75.   Bogart did not provide Plaintiff any type of managerial guidance, supervision, or communication of basic information.

76.   Upon information and belief, Bogart did provide managerial guidance, supervision, and/or basic communication to other, younger employees whom he supervised.

77.   Throughout the time that Bogart was Plaintiff's designated "go-to," Bogart interacted with Plaintiff fewer than five times, all via telephone conversations.

78.   Bogart never reviewed Plaintiff's work directly with Plaintiff, never attended a client meeting with Plaintiff, had no day-to-day involvement in any of the accounts on which Plaintiff was employed, and lacked the security clearance necessary to be informed of the details of much of Plaintiff's work.

79.   For a six-month period from April until October, 2011, Bogart never indicated to Plaintiff that his performance was lacking, provided any guidance on how to improve his performance in any way, or communicated he was Plaintiff's "go-to."

80.   Defendant's clients with whom Plaintiff worked routinely had positive reviews and comments about Plaintiff.

81.   Throughout 2011, Plaintiff was researching and authoring a third book for Defendant, on the psychology of safety, after Defendant approved the project through its formal proposal process.

11

82.    Defendant's book editor said it was the only book Gallup would publish in early 2012 and was likely to be a groundbreaking publication.

83.    Defendant's Chief Marketing Officer and Gallup Press Publisher, Larry Emond, directed that the book be completed by the end of 2011.

84.    Throughout 2011, Defendant lost the majority of its employees with the security clearances needed to work with the U.S. Intelligence Community. This was largely a result of resignations and the termination of Dr. Simon.

85.    By late summer 2011, only three consultants actively involved in the Intelligence Community work were still employed by Defendant.

86.    In July 2011, Plaintiff was told by Jon Clifton to prepare to absorb a large number of hours to make up for those who were no longer with Defendant.

87.    On or about October 6, 2011, Bogart initiated a phone call with Plaintiff, ostensibly to discuss expectations and his "utilization." The call was represented to be part of a larger initiative "as we try to set up a plan for all the SMEs, (subject matter experts) because it's been a year of ambiguity, I think, to put it lightly, so far," or words to that effect.

88.    Bogart told Plaintiff, "You continue to hang in limbo," or words to that effect.

89.    Bogart charged that Plaintiff was not novel enough in his approach, stating, "How do we push you and your thinking even more that we have in the past? You know, how do we push you to a point where there's more than thinking about the $Q^{12}$ and the

12

strengths in the way that you have historically, but kind of pushing forward a more creative thought process for our clients," or words to that effect.

90.   Bogart told Plaintiff his discussions with clients and colleagues "feel like old school," or words to that effect.

91.   Bogart told Plaintiff his work on his next book was "irrelevant."

92.   Bogart said he would do all he could to strengthen Plaintiff's positioning within Gallup.

93.   Shortly thereafter, Plaintiff requested the advice of Regional Managing Partner Randy Beck, a member of Defendant's Executive Committee.

94.   Beck told Plaintiff he should consider whether it was time to leave Gallup.

95.   Beck related how Defendant created "a world-class exit strategy" when Gallup Partner Matt Norquist indicated he was thinking of leaving Defendant. Beck told Plaintiff that Norquist was given time and assistance to find a new "better" job at higher pay.

96.   Beck told Plaintiff Norquist would "probably come back here some day, or he might be a big, huge client," or words to that effect.

97.   Upon information and belief, Norquist was 32 at the time.

98.   Beck told Plaintiff: "If you ever decide to leave Gallup, you're one of those guys that I don't want you to go feeling like you failed, feeling like you didn't perform, or feeling like you got fired. I'd want you to go because it was time."

99.   Beck said that in working in many areas of Defendant, Plaintiff was in a

13

unique job "without somebody owning it."

100.   On or about October 12, 2011, Bogart postponed his previously scheduled meeting with Plaintiff by a day.

101.   On or about October 13, 2011, Bogart told Plaintiff that Defendant had terminated Plaintiff's employment.

102.   Bogart informed Plaintiff of his termination in a phone call that lasted approximately two minutes.

103.   Bogart told Plaintiff during the call, "I'm eliminating your position, effective today," or words to that effect.

104.   Plaintiff was 50 years old when Defendant terminated his employment and had worked for Defendant for more than 12 years.

105.   The day following Plaintiff's termination, Defendant sent Plaintiff a letter informing him his investment in Defendant had been sold and the proceeds of the sale would be returned to him over a four-and-a-half year period.

106.   Defendant terminated numerous employees who were more than 40 years old, and/or pressured numerous employees who were more than 40 years to quit throughout 2011.  Most of these employees were more than 50 years old.

107.   Shortly after Plaintiff's termination, Defendant's Vice Chairman, Gale Muller, Ph.D., called Plaintiff to inquire into his wellbeing. During the conversation Dr. Muller said, "I would have handled it [your termination] differently," or words to that effect.

14

108.   Dr. Muller and Plaintiff were coauthors of Plaintiff's second book.

109.   In or around March 2012, Defendant terminated Plaintiff's former supervisor, Mary Trouba.

110.   Upon information and belief, Mary Trouba was approximately 45 years old when she was terminated.

111.   Defendant treated employees who were more than 40 years old differently than younger employees.

112.   Plaintiff was never provided any type of discipline in any way during his entire career with Defendant.

113.   Until one week before Plaintiff's termination, Defendant never indicated to Plaintiff that his performance was deficient in any way.

114.   Plaintiff routinely received positive feedback about his performance and accomplishments from Defendant.

115.   Plaintiff never received a negative performance review from Defendant.

116.   For a period of at least nine months following Plaintiff's termination, Defendant claimed on its website that Plaintiff was a principal of Defendant in promoting both of Defendant's books written by Plaintiff and in promoting Defendant's credentials to prospective clients.

117.   To date, Defendant continues to claim that Plaintiff is a principal of Defendant on its website.

118.   Plaintiff was not in fact employed by Defendant as Defendant stated on its

15

website.

119.   Defendant continues to widely quote Plaintiff's writing in support of its research and consulting services.

## COUNT ONE
## AGE DISCRIMINATION IN VIOLATION
## OF THE MINNESOTA HUMAN RIGHTS ACT

Plaintiff realleges each and every paragraph of this Complaint.

120.   Defendant engaged in unlawful employment practices involving Plaintiff by discriminating against him on the basis of age, in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01, *et seq.*  These practices include, but are not limited to, treating Plaintiff differently than other employees who were younger than him, promoting a much younger employee to be Plaintiff's supervisor, and terminating Plaintiff's employment because of his age.

121.   Plaintiff's age was a motivating factor behind Defendant's decision to terminate Plaintiff's employment.

122.   Plaintiff was 50 years old at the time of his termination.

123.   Defendant failed to take all reasonable steps to prevent discrimination against Plaintiff from occurring.

124.   The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his age.

125.   The unlawful employment practices complained of above were intentional

16

and were performed by Defendant with malice and/or with reckless indifference to the

MHRA which protects Plaintiff.

126.   As a direct and proximate result of Defendant's illegal conduct, Plaintiff

has suffered, and continues to suffer, emotional distress, mental anguish, humiliation,

embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost

wages and benefits, and has incurred attorneys' fees, costs and expenses and suffered

other serious damages.

## COUNT TWO
## INVASION OF PRIVACY/APPROPRIATION

Plaintiff realleges each and every paragraph of this Complaint.

127.   Defendant invaded Plaintiff's right to privacy by unlawfully and tortiously

misappropriating Plaintiff's name and/or likeness after illegally terminating Plaintiff's

employment.

128.   Defendant made use of Plaintiff's name and/or likeness for its own

purposes and benefit and without Plaintiff's permission or approval.

129.   Defendant's unlawful misappropriation includes, but is not limited to, using

Plaintiff's name and likeness in advertising its own products on its website, and

inaccurately stating that Plaintiff was employed by Defendant as "a principal" when in

fact he was not.

130.   As a direct and proximate result of Defendants' illegal conduct, Plaintiff

has suffered, and continues to suffer, emotional distress, mental anguish, humiliation,

17

embarrassment, pain and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees, costs and expenses and suffered other serious damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays:

a.      That the practices of Defendant complained of herein be adjudged, decreed and declared to be in violation of the rights secured to Plaintiff under applicable state laws.

b.      That Defendant be required to make Plaintiff whole for its adverse, discriminatory and unlawful actions through restitution in the form of back pay, with interest of an appropriate inflation factor.

c.      That Defendant be required to make Plaintiff whole for its unlawful invasion of his privacy.

d.      That Plaintiff be reinstated to his job or, in the alternative, be awarded front pay and the monetary value of any employment benefits to which he would have been entitled to as an employee of Defendant.

e.      That Plaintiff be awarded compensatory damages in an amount to be determined at trial.

f.      That Plaintiff be awarded punitive damages pursuant to the Minnesota Human Rights Act.

g.      That Plaintiff be awarded treble damages pursuant to the Minnesota Human

Rights Act.

h.      That the Court award Plaintiff his reasonable attorneys' fees, costs and

disbursements pursuant to applicable state laws.

i.      That the Court grant such other and further relief as it deems fair and

equitable.


**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS**


Dated this 25th day of July, 2012              HALUNEN & ASSOCIATES

                                               Michelle Dye Neumann, No. 391659
                                               Brian T. Rochel, Atty. No. 0391497
                                               IDS Center, Suite 1650
                                               80 South Eighth Street, Suite 1650
                                               Minneapolis, MN  55402
                                               Telephone:  612.605.4098
                                               Facsimile:  612.605.4099

                                               *ATTORNEYS FOR PLAINTIFF*