UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Rodd Wagner,

        Plaintiff,

v.                                                                                           Civil No. 12-1816 (JNE/TNL)
                                                                                             ORDER
Gallup, Inc.,

        Defendant.

---

Michelle D. Neumann appeared for Plaintiff Rodd Wagner.

Marko J. Mrkonich and Kristine D. Yen appeared for Defendant Gallup, Inc.

---

        Plaintiff Rodd Wagner filed this action against Defendant Gallup, Inc., alleging age discrimination in violation of the Minnesota Human Rights Act ("MHRA") and invasion of privacy based on appropriation of Plaintiff's name and/or likeness. Before the Court is Gallup's motion for summary judgment, seeking dismissal of the complaint.[1] For the reasons stated

---

[1] In response to the filing of Gallup's summary judgment motion, Wagner filed a motion for relief under Federal Rule of Civil Procedure 56(d) on August 16, 2013 and also filed an opposition to Gallup's summary judgment motion on August 22, 2013. Wagner filed his Rule 56(d) motion in light of a pending decision from the Magistrate Judge on a motion to compel certain discovery from Gallup that Wagner had previously filed and in light of Gallup's agreement to produce certain additional discovery. Wagner's Rule 56(d) motion requested additional time to respond to Gallup's motion for summary judgment after the discovery resulting from resolution of the discovery disputes had been provided. The Magistrate Judge's order issued on September 18, 2013 and granted Wagner's discovery motion in part. Wagner appealed part of the Magistrate Judge's order on October 2, 2013. At the hearing on October 24, 2013 the Court ruled on Wagner's appeal. As a result of the rulings on Wagner's motion to compel, Gallup produced additional discovery. The parties received a chance to submit supplemental briefs on Gallup's summary judgment motion just before the October 24, 2013 hearing and again on November 14, 2013, two weeks after the date by which Gallup had been ordered to complete its production. Wagner's Rule 56(d) motion was thus effectively granted in the course of the proceedings, which will now, therefore, be denied as moot.

below, the Court grants the motion as to Wagner's claim of discrimination, but denies it as to his appropriation claim.

## BACKGROUND

**A. Wagner's Employment History at Gallup**

Wagner began working for Gallup in January 1999 as a Managing Consultant in Gallup's Minneapolis office. Wagner subsequently received other designations and held the title of "Subject Matter Expert" or "SME" at the time that Gallup terminated his employment in October, 2011. At his deposition, Wagner described a SME as someone "with extensive experience at Gallup that knew one or more of the practice areas in tremendous depth." He characterized SMEs as likely to have significant experience and as tending to be "an older group within the Gallup workforce." Born in 1961, Wagner was 50 at the time that Gallup discharged him.

During his time at Gallup, Wagner performed billable work on projects for Gallup's clients. Wagner worked on focus areas such as "customer loyalty" and "employee engagement." In addition to his direct client work, Wagner co-authored two books for Gallup. The first book, *12: The Elements of Great Managing*, became a *New York Times* bestseller after its publication in 2006. According to both parties, Gallup is widely known in human resources circles for its proprietary "Q12" employee engagement metric and that concept is the subject of the first book. In 2009 Gallup published *Power of 2: How to Make the Most of Your Partnerships at Work and in Life*, which was also co-authored by Wagner.

Gallup does not give employees formal performance appraisals and so Wagner never received one during his twelve years at the company. He did, however, receive various awards over the course of his time at Gallup, from an "All-Star Award" in 2000 for the creation and

delivery of a customer loyalty and best-practice training program for a client to a "Brilliance in Government Consulting" award in 2011.  Wagner was also appointed to the company's Board of Principals, on which he served until the company disbanded it.  Additionally, Wagner testified that he received positive informal feedback when the managing partner for the Midwest region told him in 2010 that he was "the most productive SME" and had "more billable hours than anyone else."  Wagner also recalled his supervisor, or "Go To" in Gallup parlance,[2] telling him in early 2011 that his hours were "great" and that he was in "great shape."  In March 2011, Wagner was invited to participate in a stock purchase program that Gallup offered to a select and limited number of employees.

Gallup employees did receive Internal Customer Engagement ("ICE") scores twice a year based on surveys done by their coworkers aimed at measuring "intercompany relationships."  Coworkers rated each other on items directed at assessing characteristics such as "timeliness," "promise," and "partnership."  The record includes Wagner's ICE scorecards from September 2010, March 2011, and September 2011.  His overall "GrandMean" number declined over that time period compared to the mean listed for the SMEs or "Strategic Consultants," as they had also been called.  In September 2010, his score exceeded that of the group's mean, his score was at the group's mean in March 2011, and by September 2011 his score fell below the mean.  Between September 2010 and September 2011, Wagner's overall score went from 4.75 to 4.15.  While acknowledging that a half-point drop is "important," Wagner attributed the change in his numbers to differences in evaluators and numbers of evaluations at the different times.

---

[2]  Wagner characterized a Go To relationship at Gallup as more of a resource for an employee rather than a typical employee-manager relationship in which a manager has commanding authority over the employee.  Gallup's Chief Operating Officer also explained that a Go To "is different than an ultimate reporting responsibility" and a Go To helps ensure employees "have a good workload, that they are resourced, that they have a good job."

### B. Termination of Wagner's Employment

Sometime in 2011, Patrick Bogart became Wagner's Go To. Bogart was 35 at the time, but had worked for Gallup over a longer time period than Wagner. During the time that he was Wagner's Go To, Bogart worked out of Gallup's Washington D.C. office.

At the time that Bogart became his Go To, Wagner had been working on a third book. Wagner believed that the book needed to be finished by the end of 2011 based on conversations with his editor and co-author. Larry Edmond, who was the executive publisher of the Gallup Press during the relevant time, testified that Wagner had the idea for the book and had been told to write an overview or initial chapter so that it could be further assessed. Although he did not recall exactly how events played out, Edmond testified that they "never got to a place where [they] formally approved" the book and no deadline or time frame had been placed on it.

Bogart called Wagner on October 6, 2011. Unbeknownst to Bogart, Wagner recorded the call.[3] According to the transcript of that call, Bogart seemed to be continuing a conversation that the two had previously started regarding Wagner's place in the company. The conversation reflects that the situation of SMEs at the company had been in some transition and multiple SMEs had departed in the recent past. Bogart noted that the company was trying to set up a plan for the others and indicated that he had spoken to the regional managers about where they could utilize Wagner more.

Bogart explained that he was "having a tough time finding a team that really wants to, for the long term, integrate [Wagner] into their future." Wagner wanted to know "what's the hang up?" Bogart explained that he thought that the perception was that being a team player was not one of Wagner's strengths and Wagner displayed a degree of "self-orientation." At one point in

---

[3]  Wagner explained that after a prior interaction with Bogart regarding a possible project in Iraq that Wagner needed to turn down, Wagner was "suspicious" of Bogart.

4

the conversation, Bogart mentioned that Wagner needed to be careful about the "self-referential stuff" and frequent references to his publications. Wagner explained his reasons for doing so and noted that sometimes he felt like he needed to be the *Power of 2* book's "chief advocate." Bogart cautioned that he just needed to be sensitive as to whether people would find the material relevant to the business problem at hand or "does it feel like old school," to which Wagner replied:

> "Well I hope the Power 2 stuff shouldn't seem like old school, it's only a 2 year old book. The Q12 stuff I can absolutely understand that you know the same 12 questions, obviously it's a big part of our business but you don't want to be constantly going back to something that we published in 2006….let me tell you about the way back when and all that."

Bogart also mentioned the need to get Wagner to engage in a more "creative thought process" for clients, so that there would be more than just "thinking about the Q12 or the strengths in the way that [Wagner had] historically." Additionally, Bogart mentioned concern about Wagner's output relative to the amount of time he put into projects. Bogart told Wagner that the book needed to be deprioritized and they needed to focus on getting him integrated into "large accounts," presumably so that he could increase his utilization on billable work. Wagner sounded open to getting feedback and expressed a commitment to becoming more aware of and working on the issues. Towards the end of the conversation, Bogart indicated that they should talk the following week so they could make sure they were "synched up" on a "game plan."

On October 13, 2011, Bogart again called up Wagner, who again surreptitiously recorded the call. This time Bogart told Wagner that his employment was being terminated and his position eliminated. Bogart said that it had become clear to him and the team that there was "not really a path to get you – to get you utilized on our teams as we think is necessary."

After Wagner's departure in October, 2011 and at least until May 29, 2013—when Jane Miller, Gallup's Chief Operating Officer, was deposed—a "Gallup Business Journal" page on

5

Gallup's website continued to include an entry on Wagner that stated that "Rodd Wagner is a *New York Times* bestselling author and a principal of Gallup." The page described Wagner and listed the two books that he had co-authored for Gallup. Site visitors would be directed to that author-bio page if they clicked on a link tied to Wagner's name listed in articles on Gallup's site that he had written. While Wagner does not dispute that he assigned all rights to his articles and books to Gallup, he objects to Gallup's failure to change the reference on its website to clarify that he no longer worked as a principal at the company. At his deposition, Wagner testified that the pages had been reconfigured multiple times since his departure and that analogous material on other former employees specified that they were "former" principals. At her deposition, Jane Miller indicated that she had not seen those pages before. Gallup notes that the contents of the page about which Wagner complained have since been deleted.

## DISCUSSION

Gallup seeks summary judgment and dismissal of Wagner's MHRA age discrimination claim and of his appropriation claim. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must view facts that the parties genuinely dispute in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable

inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Wagner's Age Discrimination Claim Under the MHRA

Under the MHRA, unless "based on a bona fide occupational qualification, it is an unfair employment practice" for an employer to discharge an employee because of his age. *Loeb v. Best Buy Co.*, 537 F.3d 867, 872 (8th Cir. 2008) (citing Minn. Stat. § 363A.08 Subd. 2(2)). Age discrimination plaintiffs may establish discriminatory intent using direct evidence or by using circumstantial evidence in accordance with the three-part burden-shifting test set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Loeb*, 537 F.3d at 872; *Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001). Under the *McDonnell Douglas* framework, the plaintiff bears the burden of establishing a prima facie case of discrimination. *Loeb*, 537 F.3d at 872. To do so, a plaintiff must ordinarily show that he is (1) a member of a protected class; (2) was qualified for the position from which he was discharged; and (3) was replaced by a non-member of the protected class. *See id.*; *Feges v. Perkins Restaurants*, 483 N.W.2d 701, 710-11 (Minn. 1992). When the plaintiff's responsibilities are not reassigned to a specific individual, the plaintiff must satisfy the last element by showing that age was a factor in the termination decision. *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004).[4] If the plaintiff meets his burden to show a prima facie case of discrimination, the burden shifts to the employer to put forward a legitimate non-discriminatory

---

[4] While *Hitt* involved a claim under the federal Age Discrimination in Employment Act (ADEA), the similarities between the federal anti-discrimination laws and the MHRA allow for analogous treatment, *Rahlf v. Mo-Tech Corp.*, 642 F.3d 633, 638 (8th Cir. 2011), keeping in mind that in *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 180 (2009) the Supreme Court held that a "but for" causation standard applies to ADEA claims and the Minnesota courts have not addressed the causation standard under the MHRA after *Gross*.

reason for the termination decision. *Loeb*, 537 F.3d at 872. If the employer does so, the burden shifts back to the plaintiff to establish that the proffered reason is pretextual. *Id.*

Gallup contends that Wagner lacks direct evidence of discrimination. Gallup also argues that Wagner cannot meet his burden under the *McDonnell Douglas* framework that applies to cases in which no direct evidence exists. Wagner responds that he can prove his claim using the direct or indirect burden-shifting method.

Wagner's evidence is not of a type that enables him to avoid the *McDonnell Douglas* framework. Courts have found direct evidence of a discriminatory motive where a statement or policy is discriminatory on its face. *See Goins v. West Group*, 635 N.W.2d 717, 722-23 (Minn. 2001) (citing examples). "Direct evidence in this context is not the converse of circumstantial evidence," but rather refers "to the causal strength of the proof." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Wagner contends that evidence on Bogart's young age, Bogart's references to "historically" and "old school," evidence that Gallup maintained an ageist workplace, Wagner's outstanding performance record, and the unsubstantiated nature of Gallup's stated reasons for termination together amount to direct evidence of discrimination.

The Court does not find this evidence strong enough to establish "that illegal discrimination motivated the employer's adverse action," such that the *McDonnell Douglas* analysis need not be considered. *See Griffith*, 387 F.3d at 736. The various pieces of evidence to which Wagner points would require so many inferential leaps to get to a conclusion that discriminatory animus motivated the termination decision in his case that they simply cannot qualify as direct evidence. While remarks by a decision-maker may sometimes be direct evidence of discrimination, they "must show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that

the bias motivated the action." *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1045-46 (8th Cir. 2011). No reasonable fact-finder could find that Bogart's references to "historically" and "old school" during the call on October 6, 2011 reflect discriminatory animus directed at Wagner's age. Bogart used the word "historically" in explaining that Wagner should try to think more creatively for clients rather than just relying on the Q12 and other concepts as he had done in the past. The transcript of the phone-call also shows that Bogart used the term "old school" to refer to one of Wagner's books in the context of a recommendation that before constantly referring to his books, Wagner should consider whether others would find them actually relevant to the issue under consideration. The context of the conversation demonstrates that Bogart was not referring to Wagner's age in a derogatory, or otherwise problematic, manner. They do not amount to direct evidence of age discrimination. *See Erickson v. Farmland Indus.*, 271 F.3d 718, 725 (8th Cir. 2001) (noting that remarks that plaintiff was "stale and set in his ways" required inferences to get to a conclusion that the references were to his "age rather than his effectiveness" and did not amount to direct evidence of discrimination); *Ramanna v. County of Beaver*, Civ. No. 05-1738, 2008 U.S. Dist. LEXIS 72049, at *36-38 (W.D. Pa. Sept. 11, 2008) (finding that a reference to the plaintiff as part of the "old school" did not reflect age discrimination when considered in context); *Bay v. Fairfield Resorts, Inc.*, Civ. No. 06-306, 2007 U.S. Dist. LEXIS 90791, at *15-16 (E.D. Tenn. Dec. 10, 2007) (noting that references to the plaintiff being "old school" and engaging in the "old way of doing things" are "not direct evidence of discrimination because they require further inferences which are incompatible with the definition of direct evidence").

For the *McDonnell Douglas* analysis, Wagner lacks evidence showing that he was replaced by a younger person. Wagner does not contend that a younger person or persons took

over his role, although he testified about three examples of others in the company who were replaced by younger individuals. After resolution of a discovery dispute that had been underway at the time of Wagner's initial briefing, Wagner received information regarding those who took over his work on active projects. He did not subsequently argue that his responsibilities were taken over by younger individuals such that the third element can be shown.[5]

Nonetheless, given the project-based nature of the work with which Wagner was involved, relying only on the reallocation of active project work may not be appropriate. Consequently, the Court also considers whether Wagner meets his burden to show a prima facie case by otherwise putting forward evidence that age was a factor in the termination decision. Wagner points out that all the SMEs whose employment Gallup terminated since 2008 were over the age of 42. More specifically, from January 1, 2008 to October 13, 2013, Gallup had discharged five SMEs, including himself, four of whom were 50 or over and one who was 42.

Wagner also contends that the fact that he was discharged soon after Bogart, who was 35, became his Go To[6] and his evidence of a general ageist environment at Gallup can support his prima facie case. For the latter, Wagner offers his own testimony that it was common at Gallup for an older person to be replaced by a younger one and that he had not heard of many people retiring rather than being forced out. He also offers comments that he has heard, such as "[a]fter you're 50, you have a target on your back here." Other than his own testimony, Wagner also

---

[5] The list of individuals identified shows that Gallup distributed Wagner's responsibilities on active projects to seven people, some of whom were already working on the relevant projects. Of the group, five were 50 years or older at the time of Wagner's discharge. The other two were 46 and 37, and the latter was already assigned to the relevant project.

[6] The Court does not find Wagner's focus on Bogart's own age persuasive in the absence of any other evidence of age-based discriminatory animus on Bogart's part. Wagner does not cite any cases in which a court has found that discriminatory intent can be inferred based on the non-protected status of a decision-maker in the absence of any evidence of a bias on the decision-maker's part.

offers two declarations of former Gallup employees: Dan Carlson, who worked at Gallup for 20 years until 2009 and Dave Bauer, who worked at Gallup for 16 years until 2010. In his declaration, Carlson attests to Wagner's good reputation and states that "[i]n the last few years of my employment with Gallup, Gallup began a 'youthful movement' and began bringing in a lot of younger employees." Bauer comments about witnessing "a pattern of pushing out the older Gallup employees." Bauer also states that he had heard that one of the regional managers had instructed another employee not to put Bauer on a particular project because he was "too old and too slow, or words to that effect."

The admissible portions of Wagner's evidence[7] suffice for a prima facie case. *See Johnson v. Securitas Sec. Servs. USA, Inc.*, 728 F.3d 754, 760 (8th Cir. 2013) ("[T]he threshold of proof necessary to establish a prima facie case is minimal.") (internal quotation marks omitted). But Wagner's discrimination claim cannot survive summary judgment at the next stage. As legitimate, non-discriminatory reasons for termination, Gallup points to Wagner's low utilization on billable work and his declining ICE scores. Bogart testified that Wagner's client hours were low and that the regional managers did not foresee being able to use Wagner on billable client work in a major way within their respective areas. Two of the regional managers, Randy Beck and Larry Edmond, also confirmed that they did not anticipate being able to utilize Wagner. Additionally, Gallup put forward Wagner's ICE scorecards, which reflect an absolute and comparative decline from 2010 to 2011.

In response Wagner has not presented evidence from which a reasonable jury can conclude that Gallup's proffered reasons are pretextual. At this stage, the factual inquiry proceeds to a new level of specificity and Wagner must do more than merely discredit an

---

[7] Gallup objects to the admissibility of some of the statements in Carlson and Bauer's declarations on the grounds of hearsay and a failure to establish sufficient personal knowledge.

employer's asserted reasoning for the employment action. *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 856 (8th Cir. 2012). He "must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus." *Id.* (internal quotation marks omitted). To show pretext, Wagner primarily relies on his "impressive and distinguished history of excellent employment" at Gallup. But the anti-discrimination laws do not convert "at will" employment to permanent employment that can only be terminated "for cause." *See Hill v. St. Louis Univ.*, 123 F.3d 1114, 1120 (8th Cir. 1997) (discussing federal anti-discrimination laws). And Gallup does not attempt to dispute Wagner's accomplishments and contributions as an employee. Rather, its proffered reasons point to other legitimate reasons for its decision and Wagner has not shown that the reasons are a pretext for illegal discrimination.

Wagner lacks evidence that could establish pretext with regard to Gallup's first proffered reason of low utilization on billable work. Wagner does not contradict Gallup's claim that his utilization on client work prior to his discharge had been low or otherwise demonstrate that he would in fact have had sufficient hours going forward. While Wagner may have been using his time to work on a third book, it is not the role of the Court in deciding a discrimination claim to pass judgment on the propriety of the value Gallup chose to place on that activity compared to directly billable work. *See Hill*, 123 F.3d at 1120 (noting that the anti-discrimination laws do not prohibit unsound business practices and unwise personnel decisions that do not evince a discriminatory animus). While Wagner may legitimately have believed that the book needed to be completed in 2011, the record lacks evidence that anyone with authority had directed Wagner to work on a book in lieu of performing client work, such that Gallup's subsequent claim that he was discharged for low utilization might potentially raise questions.

As to Gallup's second reason, Wagner cannot dispute that his ICE scores declined. While he questions the statistical significance of the change in his numbers, his criticisms again go to the soundness of Gallup's business practices. But Gallup is entitled to use whatever measure—including ones lacking in rigor—of valued attributes it deems appropriate, as long as doing so does not illegally discriminate. Wagner has not put forward any evidence that similarly-situated younger employees were treated differently or any other evidence that might warrant deeming this proffered reason a pretext for illegal discrimination based on his age.

### B. Wagner's Invasion of Privacy Claim

Minnesota recognizes the tort of appropriation, which is one of the "traditional invasion of privacy torts." *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233-36 (Minn. 1998). The tort "is committed when one 'appropriates to his own use or benefit the name or likeness of another.'" *Id.* (quoting Restatement (Second) of Torts, § 652C (1977)). A common form of appropriation of a plaintiff's name or likeness is for some commercial purpose, such as to advertise the defendant's business or product. *Gregerson v. Vilana Fin., Inc.*, Civ. No. 06-1164, 2008 U.S. Dist. LEXIS 11727, at *28-29 (D. Minn. Feb. 15, 2008). But a commercial purpose is not required and appropriation may occur even though the benefit sought is not a pecuniary one. *Id.* Moreover, the tort is an intentional one and requires knowing appropriation of the plaintiff's name or likeness for the purpose of accruing to the defendant's benefit the commercial or other value associated with the name or likeness. *Tana v. Dantanna's*, 611 F.3d 767, 783 (11th Cir. 2010); *Kovatovich v. K-Mart Corp.*, 88 F. Supp. 2d 975, 987 (D. Minn. 1999).

Wagner claims that Gallup is liable for appropriation of his name and likeness based on its continued use, after his discharge, of the second half of the statement on its website that "Rodd Wagner is a *New York Times* bestselling author and a principal of Gallup." At the outset,

the Court notes that since the Minnesota Supreme Court first recognized the tort in its *Lake* decision in 1998, the case law in the Minnesota courts has not yet been significantly developed. *See Jalin Realty Capital Advisors, LLC v. A Better Wireless, NISP, LLC*, 917 F. Supp. 2d 927, 941 (D. Minn. 2013). Additionally, the facts on which Wagner bases his claim do not fit into the mold of the typical appropriation claim in which the defendant begins using the plaintiff's name or likeness without the plaintiff's permission. *See* Restatement (Second) of Torts, § 652C (listing illustrations such as publishing a photo in an advertisement and forming a corporation under the name of a famous person without consent). More specifically, Wagner does not dispute Gallup's contention that when Gallup first posted the statement to its webpage, the statement was accurate and Gallup was entitled to make it. Rather, Wagner faults Gallup for failing to update the page to identify him as a "former" rather than current Gallup employee.

      Gallup makes three main arguments in support of its dismissal request, none of which are availing. First, Gallup contends that because the statement was proper at the time it was written, Gallup did not have an obligation to change it and cannot be said to have wrongfully appropriated Wagner's name. In the typical scenario that gives rise to the tort, the appropriation will be an affirmative act. A failure to act, however, may suffice if the circumstances allow for an inference of intentional—which implies knowing—appropriation. *See Kovatovich*, 88 F. Supp. at 987-88 (finding that a jury could infer intentional appropriation where defendant pharmacy claimed it had accidently failed to update its pharmacy manager list, resulting in form solicitation letters being sent to customers listing discharged plaintiff as affiliated with the company). The circumstances presented by Wagner allow for such an inference of intentional appropriation. In particular, Wagner testified that the relevant pages have been reconfigured multiple times since his discharge and points out that he notified Gallup that he did not consent

to the listing of him as a current employee by filing the complaint in this action, but Gallup did not change the page for nineteen months. From these facts, a reasonable jury could infer that Gallup knowingly appropriated use of the value of Wagner's name.

Second, Gallup asserts that Wagner cannot show that Gallup appropriated his name to confer a benefit on itself. But the statement to which Wagner objected identified him as a *New York Times* best-selling author and claimed an affiliation with him. The nature of the statement could support a reasonable inference that Gallup continued to represent an affiliation that no longer existed for the purpose of deriving the benefit a company might expect from being affiliated with a person of some acclaim.

In connection with its argument that Wagner cannot show that Gallup appropriated his name intending to benefit from it, Gallup cites two cases: *Gregerson*, 2008 U.S. Dist. LEXIS 11727, at *28-29 and *Olson v. LaBrie*, A12-1388, 2013 Minn. App. Unpub. LEXIS 369, at *12-13 (Minn. Ct. App. Apr. 29, 2013). The cases, however, do not support Gallup's position. In *Gregerson*, the appropriation counterclaim by the defendants was based on the plaintiff's posting of a picture of one of the defendants as part of a description of the parties' dispute and the misdeeds of the defendants on the plaintiff's website. *See Gregerson*, 2008 U.S. Dist. LEXIS 11727, at *10-11. The court dismissed the claim after a bench-trial because the defendants had not shown that plaintiff appropriated the value of their names and likeness for his benefit. *See Gregerson*, 2008 U.S. Dist. LEXIS 11727, at *28-29. By its nature, the context in which the picture and name were used in *Gregerson* reflected the absence of any intent to derive the value of the claimant's name or likeness. In *Olson*, the party accused of appropriation had posted childhood images of the accuser without consent on a social-media site and the court found no allegation in the complaint that could support the requirement that the posting be for the purpose

15

of appropriating a benefit derived from the "reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness." *See* 2013 Minn. App. Unpub. LEXIS 369, at *12 (quoting from the Restatement (Second) of Torts, § 652C cmt. d). The posting at issue here differs in that, by its nature, it can represent an attempt to benefit from the reputation or standing of a *New York Times* bestselling author.

Finally, Gallup contends that Wagner has failed to state any damages. Although the Minnesota Supreme Court has not opined on damages issues in the context of an appropriation claim, the *Lake* opinion recognized the tort of appropriation by reference to the Restatement's formulation of it. *See* 582 N.W.2d at 233-35. Section 652H of the Restatement notes that a plaintiff who has established invasion of his privacy may recover damages for "his mental distress proved to have been suffered if it is of a kind that normally results from such an invasion." The complaint alleges damages based on the appropriation claim, including emotional distress and mental anguish. Wagner testified that it is "particularly repugnant to me that on one hand I'm sitting at my kitchen table unemployed, and on the other hand during that three-month period of time, or working for an entirely different company, and Gallup is claiming that I am a principal of their organization." For summary judgment purposes, his testimony suffices as evidence of Wagner's alleged damages. *See* Restatement (Second) of Torts, § 652H, at comment c ("The proof of actual harm need not be of pecuniary loss and in the case of emotional distress may be simply the plaintiff's testimony."); see also *Fanelle v. LoJack Corp.*, Civ. No. 99-4292, 2000 U.S. Dist. LEXIS 17767, at *40-41 (E.D. Pa. Dec. 7, 2000).

## CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiff's Motion for Relief under Rule 56(d) [Docket No. 60] is DENIED as moot.

2. Defendant's Motion for Summary Judgment [Docket No. 52] is GRANTED in part and DENIED in part.

3. Count One of Plaintiff's complaint alleging age discrimination in violation of the Minnesota Human Rights Act is dismissed with prejudice.

Dated: December 19, 2013

                                                  s/Joan N. Ericksen
                                                  JOAN N. ERICKSEN
                                                  United States District Judge